**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 0 5 2014 ★

**BROOKLYN OFFICE**

MICHAEL J. REDENBURG, ESQ. PC
Michael Redenburg, Esq. (NY #MR4662)
150 Broadway, Suite 808
New York, NY 10038
Telephone: (212) 240-9465
Facsimile: (917) 591-1667

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

DAVID BAISDEN,

                                **Plaintiff,**

v.

THE CITY OF NEW YORK, and NYPD
Officers JOHN DOES 1 THROUGH 10,
individually and in their official
capacities (the names John Doe and Jane
Doe being fictitious, as the true names are
presently unknown).

                               **Defendants.**

**Complaint**

**JURY TRIAL DEMANDED**

Civ. No.:

**CV 14   2818**

**MAUSKOPF, J.**

### PRELIMINARY STATEMENT

1. Plaintiff brings this civil rights action against the City of New York and New York City

   Police Officers John Does 1 through 10, alleging that defendants violated his rights under

   42 U.S.C. § 1983, the Fourth, Fifth and Fourteenth Amendments to the United States

   Constitution by falsely arresting him, and for the John Doe's failure to intervene and

   prevent such conduct. Plaintiff seeks compensatory and punitive damages, attorney's fees

   and costs and such other and further relief as the Court deems just and proper.

### JURISDICTION AND VENUE

1

2. This action is brought pursuant to 42 U.S.C. §§1983 and 1988, and the Fourth, Fifth & Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 and §1343.

3. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391 (b) and (c) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, Plaintiff resides in this District and because some or all of the defendants reside in this District.

## DEMAND FOR A JURY TRIAL

4. Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury in this action.

## PARTIES

5. Plaintiff David Baisden ("Plaintiff" or "Mr. Baisden") is a twenty eight (28) year old African American man who resides in the County of Kings, in the City and State of New York.

6. Plaintiff does not have a criminal record and is currently working as an intern with the MTA, New York City Transit.

7. The City of New York is a municipal corporation organized under the laws of the State of New York.

8. The individual defendants are members of the New York City Police Department ("NYPD") who were so employed on April 18, 2014. The defendants were acting under color of state law and in their capacities as members of the NYPD at all relevant times. The defendants are sued in their individual and official capacities.

## STATEMENT OF FACTS

2

9. The Incident which is the subject of the instant Complaint took place at approximately 8:15 p.m. on April 18, 2014, and in the vicinity of 345 Thatford Ave, Brownsville, Brooklyn, NY, 11212

10. At the time and place of the Incident as set forth in ¶9 above, Plaintiff was leaving his Aunt's apartment which he had been visiting, and heading home.

11. As Plaintiff was exiting the elevator in the lobby of the building, four (4) NYPD Officers were there.

12. Plaintiff was stopped by the officers for no reason and one of the officers asked Plaintiff where he was coming from.

13. In response to the officer's query, Plaintiff responded that he was coming from his Aunt's apartment.

14. Next, an NYPD Officer asked Plaintiff where he lived, and Plaintiff replied that he lived in the next building over at 365 Thatford Avenue.

15. Thereafter, the NYPD Officer asked Plaintiff, "If he had anything illegal on him," to which Plaintiff responded that he did not.

16. Next, Plaintiff was frisked.

17. Because the NYPD Officer's frisk of Plaintiff did not reveal any contraband, Plaintiff asked if he was free to leave.

18. However, Plaintiff was informed that he was not free to leave because "the captain" wanted his identification.

19. "Back-up" was called for and six (6) more NYPD Officers descended upon the scene.

20. With ten (10) NYPD Officers now present, Plaintiff was told to get against the wall and Plaintiff was handcuffed.

21. Plaintiff was thereafter transported to the 73rd Precinct for processing, arriving at the Precinct approximately 8:45 p.m.

22. Plaintiff spent more than eighteen (18) hours at the 73rd Precinct before being transported to Central Booking.

23. On April 20, 2014 (Easter Sunday), Plaintiff was arraigned at approximately 3PM.

24. At arraignment, Plaintiff learned that he had been charged with violating NY PL§§140.15, 140.05, criminal trespass in the second degree and trespass, respectively.

25. At arraignment, The People of the State of New York moved for an adjournment in contemplation of dismissal ("ACD"), but Plaintiff declined that offer, and the matter was put over to Part AP2, Brooklyn Criminal Court on April 30, 2014.

26. On April 30, 2014, Plaintiff appeared as required in Part AP2, Brooklyn Criminal Court before The Honorable Judge Walker and the matter was completely dismissed.

27. Plaintiff was detained against his will for approximately forty three (43) hours from April 18, 2014 through April 20, 2014 and missed spending the entire Easter Weekend with his family and loved ones.

28. As a result of the foregoing, Plaintiff suffered an unlawful detention, loss of liberty, emotional distress, fear, anxiety, humiliation and degradation – all to his detriment.

## FIRST CLAIM
### *Unreasonable Search and Seizure*

29. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

30. Defendants violated the Fourth and Fourteenth Amendments because they stopped, searched and seized Plaintiff without any reasonable suspicion or arguable probable cause.

4

31. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages herein before alleged.

32. As a result of the foregoing, Plaintiff suffered an unlawful detention, loss of liberty, emotional distress, fear, anxiety, humiliation, embarrassment and degradation – all to his detriment.

## SECOND CLAIM
### *False Arrest*

33. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

34. Defendants violated the Fourth and Fourteenth Amendments because they arrested Plaintiff without probable cause.

35. The defendants' intentionally confined Plaintiff, without Plaintiff's consent and against Plaintiff's will.

36. Plaintiff was at all times aware of his confinement and Plaintiff's confinement was not otherwise privileged.

37. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
### *Failure to Intervene*

38. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

39. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct and

had a duty to intervene and prevent such conduct- but consciously failed and refused to intervene.

40. Defendant John Does 1-10 swore out the criminal court complaint against Plaintiff and failed to intervene in Plaintiff's false arrest as their duty required.

41. Accordingly, the defendants who failed to intervene violated the Fourth, Fifth and Fourteenth Amendments.

42. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
### MONELL CLAIM

43. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

44. The City of New York is a "person" within the meaning of 42 U.S.C. §1983.

45. The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and NYPD, all under the supervision of ranking officers of the NYPD.

46. The aforementioned customs, practices, procedures and rules of the City and NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals;" 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals;" 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference toward the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police

officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

47. At the time of the aforementioned constitutional violations, the City and NYPD were and had been on notice of such unconstitutional conduct, customs, and de-facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part infra, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

48. The existence of the aforesaid unconstitutional customs and policies may be inferred from **repeated occurrences of similar wrongful conduct,** as documented by the following civil rights actions and parallel prosecutions of police officers:

    a. Schoolcraft v City of New York, 10-cv-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing these practices and customs);

    b. Long v City of New York, 09-cv-6099 (AJK)(S.D.N.Y.) People v Pagan, 6416-2008 (Sup. Ct. NY Co.) (officer swears out a false complaint and is convicted of falsifying police records);

c. <u>Taylor-Mickens v City of New York,</u> 09-cv-7923 (RWS)(S.D.N.Y.) (police officers at 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board against the precinct);

d. <u>Lin v City of New York,</u> 10-cv-1936 (PGG)(S.D.N.Y.) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

e. <u>Colon v City of New York,</u> 09-cv-0008 (JBW)(E.D.N.Y.) (in an Order dated November 29, 2009, denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issue were prosecuted for falsifying evidence, The Honorable Jack B. Weinstein wrote:

> 'informal inquiry by the Court and among the Judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the City approving illegal conduct of the kind now charged.'

f. <u>People v Arbeedy,</u> 6314-2008 (Sup. Ct. Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the

NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway. That kind of came to me and I accepted it-being around so long, and being an undercover." The presiding judge, Justice Reichbach, stated, "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct. Kings Co.) (Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. <u>Williams  v. City of New York</u>,  06-CV6601 (NGG) (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i. <u>MacNamara v. City of New York</u> 04-CV9216 (RJS) (JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j.  McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y) (officers fabricated evidence against and African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.  Avent v. City of New York , 04-CV-2452 (CBA) (CL) (E.D.N.Y) (same);

l.  Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y) (same);

m.  Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y) (police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD) ;

n.  Nonneman v. City of New York, 04-CV-10131 (JDR) (AJP) (S.D.N.Y) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless racially-motivated stop-and-frisk of a group of Hispanic youths);

o.  Richardson v. City of New York, 02-CV-3651 (JG)(CLP) (E.D.N.Y) (officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p.  Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers")'

q.  White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F. Supp. 365, 380 (S.D.N.Y., 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instance of police corruption"); and

r.  Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14 (E.D.N.Y) (police officer alleges retaliatory duty assignment sand harassment in response to his allegation about a racially discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department.

49. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following.

a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their superiors.  Corrupt and honest

officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them. [1]

{…}

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsification, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "Doing God's work"— doing whatever it takes to get the suspected criminal off the streets. This is so entrenched especially in high crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury he asked in disbelief, "what's wrong with that? They're guilty." [2]

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit [ing] to faking a marijuana case against one man and cocaine-related charges against another— and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a

---

[1] Mollen Commission report, p. 36
[2] Mollen Commission report, pp 40-41.

12

picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c.   In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released.[4]  Moreover, Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs form dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

---

[3] Melissa Grace, *NYPD Sgt. William Eiseman Pleasds guilty to Lying Under Oath in Plea Deal*, Daily News , June 27, 2011, available at http://www.nydailynews.com/news/crime.nypd-sgt-william-eiseman-pleads-guily-lying-oath-plea-deal-article-1.129288

[4] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJV0gv4Ndeqcl.

Their reasons could range from trying to cut down on paperwork to being lazy when filing arrest and incident reports.[5]

d.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brother in Kings County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th precinct of the NYPD, which used to be under Mr. Kim's command, is also under investigation by the United States Attorney's Office for "planting drugs on suspects and stealing cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to the arrest.  According to the Assistant United States Attorney Monica Evans, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e.   In December 2009, two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from Internal Affairs Bureau.  As explained in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

---

[5] Id.

[6] John Marzulli, *Claims of Corruption in Kings Precinct Put Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 28, 2009, available at http:/www.nydailynews.com/news/crime/claims-correuption-Kings-precinct-put-crooked-sentencing-hold-article1.296352

14

Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but hey claimed that they had seen him selling the bogus butts to two people, according to sources.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as not to tip off Stuges and Tirado about the sting.

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.

The officers were indicted for felony perjury, filing a false report and filing a false instrument. [7]

---

[7] Id.

　
f.  In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted, "Officer Spencer falsely reported to the assistant district attorney that he seen[the plaintiff] beckon to three passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for the offense."[8]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct- are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[9]

50. Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

---

[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News July 30, 2010, available at http://www.nydailynews.com/ny_local112010/07/30/2010-07-30/brooklyn_cops_charged_with_barging_int_sting_operation_arresting_a_fellow_offic_html.
[9] Id.

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals." [10]

b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports.  She added, "the bottom line in everybody's individual activity is being looked at."  Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island – she said only officers with "good productivity" will get the opportunity to work overtime. She also said Cpt. James Sheerin wanted every officer to make at least one arrest per month – up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts.  "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[11]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audio tape obtained by the media.  The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss to wit; a patrol supervisor at the 441st Precinct is overheard saying: " If you think one and 20 is breaking your balls,

---

[10] Jim Hoffer NYPD Officer claims pressure to make arrests WABC TV Eyewitness News, March 2, 2010, available at http:J/abclocal.go.com/Wabc/story?section=news/investgators&id-73053S6 ("Police Officers like others who receive compensation are provided productivity  goals and they are expected to work")
[11] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas*, N.Y Daily News, March 3, 2011

guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers "Next week 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then." [12]

d.  The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bust stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring. [13]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than once seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[14]

f.  In December of 2012 and in response to the pressures from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons

---

[12] Id

[13] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8. 2010.

[14] Tom Namak and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, avaiklabel at http: //www.nypost.com/p/news/11/space_hogs_lapped_on _empty _subways.

boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[15]

g.  In response to the planned summons-boycott at the 79th Precinct on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police officer quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people like he did when he was the commanding officer of the 75th Precinct in East New York. [16]

h.  Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that the arrest numbers are a factor in evaluating an officer's performance.[17] Ultimately, the jury in that case judged that the police had a policy "regarding the number arrests office were to make that violated plaintiffs constitutional rights and contributed to her arrest."[18]

i.  The New York City Office of Collective Bargaining concluded that officers in Brooklyn 75th Precinct were required to issue four parking tickets, three moving

[15] Rocco Parascandola, *Irate cops at the 79the Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, available at
http://www.nydailynews.com/news/12_bklyn_cops_threaten_tixwriting_boycott.
[16] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec 15, 2901, available at http://www.nydaily news.com/ny)local_12/15/2010-12-15_summons_strike_i_dare_ya_deputy.html
[17] William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011 at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb 15, 2011, at 201, also available on Westlaw at 20WLNR 2986205
[18] Oren Yaniv, *Court rules that cops do not use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/ny_crime/201J/02119/2011-02.

violation citations; three "quality -of-life" summonses and make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that he NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[19]

j.   Kiernan Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to the New York Daily news:

> The Incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton the told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states.

---

[19] *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, available at http://www.thenewspaper.com/news/09/914.asp; see also, Kirsten Cole. *NYPD's Bogus Little Secret: Parking Ticket Quotas- Agents Often Caught Citing You For Violations You Didn't Commit;* WCBSTV.com, August 14, 2007, available at http://wcnbsytv.com/topstories/parking.ticket.blits.2.246533.html.

Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher. [20]

51. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced <u>inter alia</u>, by the following:

52. With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb 14, 2013) Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of providing deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[21] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

53. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

---

[20] Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at
http://www.nydailynews.com/news/ny_crime/207/11_14/214_nypd_captain_alegedly_Caught_in_arrest.
[21] Id. At 34.

In the face of this problem [of corruption], the [NYPD] allows its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising.  No institution wants its reputation tainted, especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anticorruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to fallow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered.   This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, to police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it. [22]

54. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

55. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread...custom or policy by the city approving illegal conduct" such as lying

---

[22] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files_Special%20Reports/4%20-%20Mollen %20Commisiono/%20-%20NYPD.pdf

under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[23]

56. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra— they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at least, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement and/or encouragement of unconstitutional policies, customs and practices.[24]

57. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[25] When it does, however, Commissioner Kelly controls whether the NYPD

---

[23] Loren Yaniv and John Marzuli, Kelly Shrugs Off Judge Who Slammed Cops, New York Daily News, December 2, 2009, available at http://www.nydailkynews.co/news/crime/police-commisioner-kelly0shrugs-judge-slammed-cops-article-1.433710

[24] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More the $1.5 Million in Settlements*, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbara-team-finest-artcile-1.1348075

[25] IN 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). IN 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only (about 5%). See, CCRB, Jan.-Dec. 2007 status Report at p.19, available at http://www.nyc.gov/html.ccrb/pdf/ ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above –noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers

pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 36% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[26] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[27]

58. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, inter alia by the following:

59. In a suit filed in 2012, Office Craig Matthews alleged that he was systematically retaliated against for speaking to his precinct commanders about the pressure that the NYPD's illegal quota system placed on officers. [28]

---

refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors, and/or subordinates

[26] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.
[27] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.
[28] Al Baker, *Bronx Police Precinct Accused of Using Quota System*, N.Y. Times, Feb 24, 2012 available at http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.htme?r-0.

60. In <u>Griffin v. City of New York,</u> 880 F, Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on his locker and faced other repercussions from fellow police officers that his supervisors failed to address.[29]

61. Former New York County District Attorney Robert Morgenthau, has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully.

62. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

63. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

64. The existence of the above-described de facto unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including without limitation, Commissioner Kelly.

65. The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by

---

[29] Id at 389-92. See also Joseph Goldstein, *Officers Exhorted to Report Corruption, Still Fear Retaliation*, N.Y. Times, June 25, 2012, available at http:///www.nytimes.com./2012/06/25/nyregion/new-york-police--offices-face-retaliation-for-reporting-corruptin.html?partner-rss&erne-rss&pagewanted=a.ll

25

either themselves or their fellow officers, supervisors, and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testifying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

66. All of the foregoing acts by defendants deprived Plaintiff of his federally protected rights, including, but not limited to the constitutional rights enumerated herein.

67. Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

68. Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

69. Despite knowledge of such unlawful de facto policies, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including

Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such policies, practices and/or customs, or otherwise properly train police offices with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices, and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practice and/or customs or the constitutional rights of persons in the City of New York.

70. The aforementioned City polices, practices, and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendant's violations of Plaintiff's rights.

71. Plaintiffs injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto polices and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

72. As a result of the foregoing, Plaintiff suffered an unlawful detention, loss of liberty, emotional distress, fear, anxiety, humiliation, degradation – all to his detriment.

## PRAYER FOR RELIEF

27

**WHEREFORE**, Plaintiff respectfully requests judgment against defendants as follows:

    a.  Compensatory damages against all defendants, jointly and severally;

    b.  Punitive damages in an amount to be determined by a jury;

    c.  Reasonable attorneys' fees and costs; and

    d.  Such other relief as this Court shall deem just and proper.

Dated: May 5, 2014
       New York, NY

s/
Michael J. Redenburg (NY #MR4662)
MICHAEL J. REDENBURG, ESQ. PC
150 Broadway, Suite 808
New York, NY 10038
mredenburg@mjrlaw-ny.com
1-212-240-9465 (Phone)
1-917-591-1667 (Fax)